ESTATE OF WILLIAM A. FRIEDERS, DECEASED, ELMER FRIEDERS, EXECUTOR, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Frieders v. Commissioner
Docket No. 4253-77.
United States Tax Court
T.C. Memo 1980-184; 1980 Tax Ct. Memo LEXIS 398; 40 T.C.M. (CCH) 403; T.C.M. (RIA) 80184; May 27, 1980, Filed Chester A. Lizak, for the petitioner. Ronald A. Stein, for the respondent. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Judge: Respondent determined a deficiency of $89,230.37 in petitioner's Federal estate tax. The only issue for decision is the fair market value on May 14, 1973, of approximately 92 acres of real estate located in Naperville Township, DuPage County, Ill., which was included in the gross estate of the decedent for Federal estate tax purposes. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and attached exhibits are incorporated herein *399 by this reference. Elmer Friders is the executor of the Estate of William A. Frieders, deceased, and resided in Auroa, Ill., when the petition was filed in this case. William A. Frieders died testate on May 14, 1973, seized of approximately 92 acres of real estate (herein referred to as the Frieders property) located in Naperville Township, DuPage County, Ill. For purposes of reporting decedent's Federal gross estate, petitioner returned the Frieders property at a fair market value of $184,000, or $2,000 per acre. The Frieders property is not land-locked; ingress and egress are by way of Reckinger Road, a 60 foot wide public right-of-way which deadends at the western boundary of the property. Reckinger Road proceeds westward to Farnsworth Avenue. Farnsworth Avenue provides access to the East-West Tollway (Highway 5) which proceeds eastward to Chicago. The downtown area of the city of Aurora is about 2-1/2 miles to the southwest of the Frieders property and the city of Naperville is about six miles to the east. The topography of the Frieders property is gently rolling terrain with areas both slightly above and slightly below road grade. There are no drainage problems. *400 As of the valuation date, i.e., May 14, 1973, the Frieders property was serviced by a private well and septic system. Available utilities in the area included gas, electricity, and telephone. The property was zoned R-3 for residential single family uses. It is improved with on older frame farm house containing six rooms, one older frame barn, and a machine shed. The trend in the area surrounding the Frieders property was toward the development of vacant unimproved farmland for multi-family and single family residential uses as of the valuation date. Donald P. Neuses prepared an appraisal of the fair market value of the Frieders property as of May 14, 1973. He is a qualified expert real estate appraiser and land use planner who personally inspected the property. It was his opinion that the fair market value of the property as of May 14, 1973, was $460,000, or $5,000 per acre. Mr. Neuses used the market data method in making his appraisal of the Frieders property. He considered many sales in Formulating his appraisal, as well as information obtained from brokers, other appraisers, and others knowledgeable about real estate prices in that area. Among the sales which *401 Mr. Neuses considered in formulating his appraisal of the Frieders property were the sales of six parcels occurring within the vicinity of the Frieders property during 1972 and 1973, the details of which sales are fully set forth in his appraisal report. These well all bona fide sales between willing sellers and willing buyers. The location, date of sale, acreage, zoning, utilities, price, and price per acre of the six parcels are set forth below: Parcel 1
Location:
The west side of Eola Road, north
Of North Aurora Road, in an unincor-
porated area of Naperville Township,
DuPage County, Illinois.
Date of Sale:
April 12, 1972.
Acreage:
88.21 acres.
Zoning:
M-2 and R-3.
Utilities:
Gas, electric and telephone.
Sale Price:
$502,260.
Price Per Acre:
$5,693.
Parcel 2
Location:
111.924 acres located in Section 7,
8, 17 and 18, Naperville Township,
DuPage County, Illinois.
Date of Sale:
July 5, 1973.
Acreage:
111.924 acres.
Zoning:
R-3.
Utilities:
Gas, electric and telephone.
Sale Price:
$839,430.
Price Per Acre:
$7,500.
Parcel 3
Location:
North of North Aurora Road, and east of Shore Road, in an unincorporated
area of Naperville Township, DuPage
County, Illinois.
Date of Sale:
June 21, 1973.
Acreage:
34 acres.
Zoning:
R-3.
Utilities:
Well and septic.
Sale Price:
$173,088.
Price Per Acre:
$5,090.
Parcel 4
Location: The west side of Eola Road, approximately
1,200 feet south of Claim
Street, unincorporated Naperville
Township, DuPage County, Illinois.
Date of Sale:
March 29, 1972.
Acreage:
19.58 acres.
Zoning:
R-3.
Utilities:
Well and septic.
Sale Price:
$149,850.
Price Per Acre:
$7,653.
Parcel 5
Location:
Along and south side of Aurora Road,
just east of the DuPage County-Kane
County Line, unincorporated Naperville
Township, DuPage County, Illinois.
Date of Sale:
March 17, 1972.
Acreage:
34.72 acres.
Zoning:
R-3.
Utilities:
Well and septic.
Sale Price:
$224,690.
Price Per Acre:
$6,472
Parcel 6
Location:
South of Molitor Road, just east
of the Kane County Line, unincor-
porated Naperville Township, DuPage
County, Illinois. (Lorenz's Farm)
Date of Sale:
September 13, 1972.
Acreage:
104.81 acres.
Zoning:
R-3.
Utilities:
Well and septic.
Sale Price:
$602,657.50.
Price Per Acre:
$5,750.
*402 The Frieders property and the six parcels used by Mr. Neuses as comparables are all located within about two miles of one another, with Parcel 6 being continuous to the Frieders property to the east and Parcel 2 being continuous to the south. The Frieders property (as of May 14, 1973) and the six parcels (as of their respective sale dates) were comparable properties. In formulating his appraisal of the Frieders property, Mr. Neuses took into account and adjusted for the various differences affecting value, including physical characteristics, zoning, frontage, and location of the comparable properties. During the early 1970's, there was discussion of a proposed freeway, the Fox Valley Freeway, to be located in the western part of Naperville Township. Real estate prices at that time were rising in the Naperville Township. In early 1973, real estate investors and sellers were put on notice of a significant, contemplated land use shift from agricultural to residential uses, to be highlighted by the construction of the Fox Valley Shopping Center. It is a large shopping center containing more than 100 stores, including Sears, J. C. Penney, Lord & Taylor, and Marshall Field. *403 It is located about two miles to the southeast of the Frieders property. During 1972 and 1973 there were at least three major investors purchasing property in the vicinity of the Frieders property, namely, the Crowns, a wealthy Chicago family, Metropolitan Structures, Inc., a very substantial developer, and Urban Investment and Development Inc. The Frieders property is in a corridor bounded by the Fox Valley to the west, which is expanding eastward, and western DuPage County, which is expanding westward. The corridor has experienced substantial growth. The highest and best use of the Frieders property as of the valuation date was a speculative, i.e., an investment, use. All of the properties which the Crowns acquired in the vicinity of the Frieders property were purchased through nominees and held in land trusts. The purpose of using nominees was to keep the identity of the Crowns, as the real purchasers, secret; the purpose of using land trusts, with the trustees as legal title holders, was to keep the identity of the Crowns, as the real owners, secret. Real estate sellers in the Naperville Township did not know they were dealing with the Crowns, nor did they know *404 what properties the Crowns owned. Gerald Anderson, a real estate broker, was employed by the real estate firm of Bennett & Kahnweiler to assist in puchasing properties on behalf of the Crowns in the Naperville Township. In 1973 Mr. Anderson attempted to assemble three properties, including the Frieders property, for which the average price to be paid was about $6,000 per acre. However, the sale was not consummated. One of the property owners wanted $8,500 per acre for his property. One wanted in excess of $6,000 per acre. The Friders property (exclusive of improvements) was determined in 1972 to have a fair market value for DuPage County real estate tax purposes of $458,712 or $4,986 per acre. ULTIMATE FINDING OF FACT The fair market value of the Frieders property on May 14, 1973, was $460,000 or $5,000 per acre. We are confronted here with one factual issue--the fair market value of the Frieders property on May 14, 1973. Petitioner contends that the property had a fair market value on that date of $184,000 or $2,000 per acre. To the contrary, respondent now maintains that its value was $460,000 or $5,000 per acre. [1]
*405 We agree with the respondent and, in making our ultimate finding of fact, we have relied principally upon the appraisal report of and testimony of Donald P. Neuses, who was respondent's expert witness. Our reasons are set forth below. Section 2031 [2] provides that the value of the gross estate of a decedent shall be determined by including the value at the time of his death all property wherever situated. Section 20.2031-1(b), Estate Tax Regs., provides that the value of every item includable in the decedent's gross estate, with exceptions not applicable here, shall be its fair market value at the time of the decedent's death, and that the fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having knowledge of relevant facts. Respondent supported his determination in this case with the expert opinion of an experienced local real estate appraiser and with documentary evidence buttressing the opinion. *406 The evidence consisted of an appraisal report by and the testimony of Donald P. Neuses concerning the value of the Friders property as of May 14, 1973. Mr. Neuses is an independent local appraiser with 22 years of real estate appraisal experience. He is a member of the American Society of Appraisers and of the American Institute of Appraisers. He has taught courses about appraising; he has written an article about it; and he has acted as consultant to various local agencies and municipalities, including the State of Illinois. He has appraised numerous parcels of land in the Naperville Township and is familiar with the market trends in the area. In addition to his appraisal experience, Mr. Neuses has also had land use planning experience; he was a member of the American Society of Planning Officials; and he was former chairman of the Lombard, Illinois, Planning Commission. It was the expert opinion of Donald P. Neuses, based upon his personal inspection of the Frieders property and upon the results of his research, that the fair market value of the Frieders property, as of the valuation date, was $460,000, or $5,000 per acre. His appraisal report sets forth pertinent city and *407 neighborhood data concerning the cities most proximate to the Frieders property (viz., Aurora, less than three miles to the west, and Naperville, about six miles to the east), information concerning the physical characteristics, location, configuration of the property, its accessibility to roads, and his observations that the trend in the surrounding area has been toward the development of vacant unimproved farmland for multi-family and single family residential uses. In his appraisal report Mr. Neuses set forth the three generally accepted and used methods of appraisal--the income method, the replacement method, and the market data (or comparable sales) method. He chose the market data method in valuing the Frieders property because, in his opinion, it was the most appropriate method in this case for valuing raw land. [3] The market data method consists of gathering sales data respecting sales to comparable sites, then analyzing the data and making adjustments for various differences between the comparables and the property being appraised which affect value, such as size, location, availability of utilities, and availability of access. *408 Mr. Neuses testified, and his appraisal report states, that he considered many sales in formulating his appraisal, as well as information obtained from brokers, other appraisers, and others knowledgeable about real estate prices in the area of the Frieders property. His appraisal report sets forth particulars concerning the sales of six parcels within the vicinity of the Frieders property. Mr. Neuses stated that he considered the six parcels to be comparable to the Frieders property. He also stated that, in formulating his appraisal, he took into account and adjusted for various differences affecting value, such as time, location, configuration, availability of utilities, and road frontage.
We are persuaded that elements of comparability existed between the Frieders property as of the valuation date and the six parcels selected by Mr. Neuses as of their respective sale dates. These elements are: (1) All the properties were zoned similarly. (2) All were located in unincorporated areas of the Naperville Township. (3) All had structural improvements. (4) All are within two miles of one another (with Parcel 6 being contiguous to the east and Parcel 2 being contiguous *409 to the south). (5) All were without sewer and water utilities. (6) Parcels 1, 2, and 6 and the Frieders property have about the same acreage. (7) Parcel 6 has only modest frontage on Molitor Road, and Parcels 4 and 5 also have only modest frontage. The time differential between dates of sale of the six parcels and the valuation date also points to comparability. parcels 1 and 4 were sold about one year prior to the valuation date, and Parcel 6 was sold about eight months prior thereto, all during a period of rising land prices in Naperville Township. Sales of Parcels 2 and 3 occurred within two months after the valuation date. As to the highest and best use of the Frieders property, it was the opinion of Mr. Neuses that, as of the valuation date, it was a speculative, i.e., investment, use. Mr. Neuses further testified that he was familiar with the market trends and conditions in the general area of the Frieders property around the valuation date. According to him, the Fox Valley (embracing the city of Aurora) was expanding eastward. A corridor of land, including the Frieders property, which Mr. Neuses denominated the "Fox Valley corridor," bounded by the Fox River *410 to the west and western DuPage County to the east, experienced tremendous developmental growth. In support of his determination of highest and best use, Mr. Neuses pointed to several socioeconomic forces influencing the Naperville Township market around the valuation date, including the presence of a prominent investor (the Crowns) in the corridor, the proposal of the Fox Valley Freeway, and the announcement of the construction of a major regional shopping center, viz., the Fox Valley Shopping Center. In addition to Mr. Neuses' opinion of fair market value, respondent offered in evidence certified copies of two DePage County Property Record Cards reflecting that the Frieders property (exclusive of improvements) was determined, for DuPage County real estate tax purposes, to have a fair market value in 1972 of $458,712, or $4,986 per acre. [4] This Court has approved the use of such assessments as one indicator of value when, as in this case, the relation between assessed value and fair market value is demonstrated. See ; . *411 Respondent's position is further supported by evidence showing that at about the same time Gerald Anderson tried to acquire the Frieders property on behalf of the Crowns for about $6,000 per acre, but Elmer Frieders would not accept it; that there was discussion of the proposed Fox Valley Freeway to be located near the Frieders property; that there was the public announcement of the construction nearby of the Fox Valley Shopping Center; that major developers and the Crown family were acquiring land in the vicinity of the Frieders property; and that the Frieders property lies in a corridor of real estate which experienced tremendous developmental growth. Petitioner relies strongly on the testimony of Gerald Anderson, a real estate broker and builder, in contending that the sales of five of the six parcels used as comparables by Mr. Neuses involved "unwilling sellers." We reject this contention for several reasons. First, it is not supported by the evidence. It is nothing but lay opinion. Mr. Anderson provided no basis for his opinion other than the fact that he had to contact some of the sellers on more than one occasion and, to the best of his knowledge, when he contacted each *412 of them, only one had previously listed his property for sale. This is certainly not probative of the seller' state of mind and it fails to establish that each seller was "unwilling" at the time of sale, at which point each seller had presumably struck what he considered to be a satisfactory and fair bargain. Second, it is significant that petitioner did not call any of the sellers to testify at trial, which permits the inference that the sellers would not have testified favorably to petitioner. ; , affd. . Third, the petitioner's interpretation of the term "unwilling seller" is strained. It implies that a person who does not offer his property for sale or does not immediately accept an offer when made is an "unwilling seller." This is incorrect. Moreover, an "unwilling seller" has been traditionally viewed as a financially embarrassed person who is forced to sell property for less--not more--than its fair market value. In short, we give no weight to Mr. Anderson's opinion as *413 to the fair market value of the Frieders property on May 14, 1973. Petitioner also offered the testimony of Wilton Battles, a land use and zoning consultant, in support of his arguments that (1) all of the parcels used by Mr. Neuses are more desirable than the Frieders property from the standpoint of a land developer and (2) because of certain real estate assemblage activity which occurred in the vicinity of the Frieders property around the valuation date, the prices paid for the six parcels are not reflective of the fair market value of the Frieders property. Mr. Battles identified an aerial photograph showing the Naperville Township, an overlay showing the proposal location for the Fox Valley Freeway and interchanges, an overlay showing soil conditions on the Frieders property and surrounding parcels, an overlay showing what petitioner denominated "the Crown assemblage" (a group of properties allegedly acquired by the Crowns), and a map showing the public sewer system of the Aurora Sanitary District. In substance, Mr. Battles expressed his opinion "from a land use planner's point of view" as follows: (1) During the early 1970's, there was discussion of a freeway, i.e., the *414 Fox Valley Freeway, which was proposed to be located in the western part of Naperville Township, and some of the six parcels used by Mr. Neuses would have benefited from having frontage on or proximity to the proposed freeway. (2) The Frieders property suffered from certain developmental handicaps, i.e., lack of access to a public sewer and water system, poor soil conditions for septic system development, lack of road frontage, poor access, and poor configuration. The Frieders property was not in the Aurora Sanitary District as of the valuation date, and overcoming the sewer problem would be costly. (3) Some of the six parcels acquired value as part of the Crown assemblage. We do not find Mr. Battles' opinion persuasive. First, even if the proposed location of the freeway would have had a positive, rather than a negative, effect on the value of the properties near it, there is no reason to believe that the value of the Frieders property would not have also been enhanced by its proximity to the freeway and interchanges. We note that Parcels 3, 5 and 6 would not have fronted on the freeway, yet all of them sold for more than $5,000 per acre. Second, Mr. Battles' criticisms of *415 the physical characteristics of the Frieders property were, for the most part, applicable to the six parcels as of their respective dates of sale. Third, we think that Mr. Battles' testimony that some of the six parcels acquired post-assemblage suitability for development and enhanced value adds nothing to the petitioner's case. Even if we assume that the Crown assemblage would have enhanced the value of the six parcels by increasing developmental possibilities, there is no reason to assume that it would not have similarly enhanced the value of the Frieders property if it had been added to an assemblage. We think the evidence in this record shows that the six parcels used by Mr. Neuses, as of their respective dates of sale, and the Frieders property, as of its valuation date, shared many of the same characteristics which Mr. Battles criticized. Hence, either all of these properties, viewed in isolation from one another, are marginal pieces of agricultural property or all are suitable for other uses. Furthermore, if Mr. Battles was suggesting that the prices paid for the six parcels reflected their fair market value as seen against the backdrop of the Crown assemblage, then such *416 suggestion assumes that the sellers of these parcels were aware of the Crowns and their acquisition designs, an assumption which the record does not support and which points to the conceptual difficulty in petitioner's case. Petitioner introduced into evidence two United States Department of Agriculture tables which reflect average price level changes in Illinois farm land during the past decade and six newspaper advertisements dated from July through October 1979, offering the Frieders property for sale at $5,500 per acre. Petitioner argues, in substance, that he was unable to sell the Frieders property for $5,500 in late 1979 and that since, according to his interpretation of the Department of Agriculture tables, it would be worth about three times more than it was in 1973, it must have been worth less than $2,000 in 1973. We do not agree. The Department of Agriculture tables purport to reflect only statewide price level changes and do not purport to reflect price changes in any particular locality, such as the Naperville Township. Petitioner made no effort to show that the real estate market and socio-economic climate in late 1979 in the Naperville Township were the same as *417 in 1973. Consequently, whether or not petitioner was unable to sell the Frieders property in late 1979 is irrelevant to the issue of its fair market value on May 14, 1973. All in all, it is our judgment that the most reliable evidence and the most accurate opinion of the fair market value of the Frieders property on May 14, 1973, is contained in the appraisal report of Donald P. Neuses. Accordingly, we have found and hold that its fair market value on that date was $460,000 or $5,000 per acre. Decision will be entered under Rule 155. Footnotes
1. In his notice of deficiency respondent determined that the fair market value of the property was $483,000 or $5,250 per acre.↩
2. All section references are to the Internal Revenue Code of 1954, as amended and in effect at the time of the decedent's death on May 14, 1973.↩
3. Although various structures exist on the Frieders property, Mr. Neuses disregarded these in formulating his appraisal, since, in his view, they added little to the value of the land because of their age.↩
4. Ill. Rev. Stat., ch. 120, § 499 (1971) provides that all real and personal property within the State of Illinois shall be assessed and taxed, except as so much hereof as may be exempt by statute. Ill. Rev. Stat., ch. 120, § 501 (1971) provides that each tract or lot of real property shall be valued at its fair cash value. Ill. Rev. Stat., ch. 120, § 482 (24) (1971) provides that the term "fair cash value" means 50 percent of the actual value of real and personal property, except in counties with a population of more than 200,000 which classify real property for purposes of taxation. DuPage County has never classified and does not currently classify real property for purposes of taxation. The 1972 assessment figures relating to the Frieders property per the property record cards total $229,331, twice which is $458,662.↩